City of Holly Hill. James Kellogg Green is here for the appellants. Bruce Bogan is here for Appley Snowden. Erin O'Leary is here for Appley Bisland. Alyssa Flood is here for Hill and Champion. And Gary Glassman is here for Daytona. Mr. Green, you may begin. Morning, your honors. Let's start backwards. In August of 2017, Glenn Landau was acquitted of grand theft and violations of the tolling statute. The state judge found that there was under there no set of circumstances had Landau committed grand theft because he didn't drive the stolen Mustang off the lot. As to the tolling and every step... Mr. Green, can I stop you for a second? Because I know you rely to a degree on that acquittal and I understand why, of course. But my conceptual difficulty is that an acquittal based upon a beyond a reasonable doubt standard may be informative of but is not determinative of whether or not there was probable cause or arguable probable cause for an arrest in the first place. Can you try to connect those two for me? In other words, you can have probable cause to arrest somebody and the evidence can be insufficient as a matter of law in fact to convict beyond a reasonable doubt. Both of those things can be true at the same time. And so I guess I'd like you to try to explain to me why it is that in this case the acquittal shows that there could not even have been probable cause for the arrest insofar as the malicious prosecution claims are concerned. On its face, it does not. However, if you look at this in the context, in the totality of the circumstances, you got a key witness from Holly Hill Police Department, Nicholas Champion, who recanted his testimony when confronted with possible perjury. He, according to him, he gave a copy of the tow sheet to the towing tow truck driver. The guy who came to pick up the car? Yes, and allegedly said that it belonged to Gary Yeoman's Ford. We know that there's a dispute about that from Mr. English. We also know that the search warrant and the arrest warrant, which are inextricably intertwined, albeit separated by seven hours of time, contained a number of partially false statements as well as various omissions. So I think the reason I wanted to start backwards is to kind of set the tone. I think it was important that in terms of the tolling statute, the tolling statute, based upon the state attorney prosecutor's theory, was if he violated the tolling statute, he would be charged with grand theft. That's an oversimplification, but that's basically the, it was the rationale that Judge Foxman stated when he granted the directed verdict. I'll ask you a question about Champion's testimony. So you said that, and you said throughout your briefs that he recanted his testimony and sort of changed his testimony. I thought, having looked at this, I thought that his testimony changed to the extent he had previously said, I gave the tow sheet to, I believe, English. I gave the tow sheet to English. And then he said, you know what, I don't know whether it was me or my partner that gave the tow sheet to English. But he didn't say, you got me, I didn't give the tow sheet to English. Am I understanding that right? Well, it's undisputed that he was shown, that English was shown the way he was shown it. However, what you need to look at is, he went back to fill in, he went back and did an inventory search the following day after the tow, which, and the tow sheet would contain the information about the, about the, the inventory. There were, and he also said that he was going to fax the tow sheet to Friars, which he never did. Also, apparently he, and I don't know if this is in the record, but I was told by my, by the trial counsel, Mr. Marks, that he was, he recanted his testimony after being confronted with a handwriting expert's determination that the, that the body of the tow sheet was not in English, in Champion's handwriting as compared to other tow sheets that Champion had pulled out. Not in the record? I, I understand. Well, let's talk about qualified immunity now, and you say that qualified immunity should be denied because Bruce v. Berry has clearly established law that should have placed the officers on notice that this was an unconstitutional pretextual search? Yes. Okay, and so they argue that, well, Bruce v. Berry is different because there were no guns drawn and all they did was search for documents. Well, this is different. Well, here, well, actually it's not different because here they came to the, they, on the, keep in mind there were two separate searches, one on July 9th of 2014. We're dealing with the second search. I know, we're talking about the second search, but I think you need to look at both in context to determine whether this, the second search on February 12th crossed the line from administrative search to a criminal search. We know that there was a criminal investigation. We know that the officers showed up with a tow truck operator ready to tow away, as it turns out, the HHR vehicle. I'd never heard of HHR before, but apparently that's a model of a search. Bruce v. Berry clearly states that the law was clearly established as of the time that Bruce v. Berry was decided that the statute, that the search, administrative search, cannot exceed the scope of the statute. The scope, the statute clearly limits the administrative search to inspection, not to seizure of any documents or any vehicle. I think that's an interesting question, the scope of the statute. Is that clearly established somewhere? Because I couldn't find any Florida law about the scope of the statute. Well, the word inspect, I think, is pretty clear. It does not, and they. Yeah, so, I mean, I just don't know if that's true. And so, I mean, let me just give you a hypothetical. I mean, let's say, so I'm an officer, or here's a better, here's a better example. When they inspect bags at TSA, when you're going through the security screen, if they have the right to inspect, wouldn't it presuppose that if they found contraband, they wouldn't have to give it back to you and send you on your way, that they could seize it? Well, I'd say in this context, because they're allowing search of private property, that the statute has to be interpreted as it was strictly in the Bruce v. Berry case. It says any actions beyond the scope of what in this case was an inspection would violate the statute. What the police officer should have done in this case is when they came across some documents that perhaps they wanted to seize, or the HHR vehicle, they should have stood down, stood guard, and gone and gotten a warrant. But then they, but if I'm, refresh my recollection, it may be that they started taking this stuff off the lot before they got the warrant, but didn't they get a warrant within like two hours? No, seven. Seven hours? Okay, seven hours from when? Okay, they entered the property approximately 10 o'clock a.m. When they arrived at the property before that, they had a tow truck operator on standby, ready apparently to tow away the HHR vehicle. This was the February 12th administrative search, actually we contend it was a full-blown criminal search, because there were 13 officers at least with, in tactical gear. We had the officers trying to force open locked cabinets. We also had them, they also had an arrest warrant for Mr. Landau, and he stayed at the scene at least until 11 o'clock a.m. We had, there was video surveillance which we cited in the case. I had nothing in her hands when she went in and then came out with a bunch of. We're dealing with Bruce versus Barry. Bruce versus Barry. Yes. That's clearly established law. Yes. And so in that case, we rejected the argument of the plaintiff that the administrative search exception is unavailable. We said, quote, anytime law enforcement has particularized suspicion, but we said we do not address today where to draw that line. Because in the Barry case, in Bruce versus Barry, the police lacked direct criminal suspicion. So since we reserved the line drawing for a later day, how could we say that the law was clearly established? First, the statute itself can create a clearly established what the law is. We go back to that Tennessee case decided probably in the late 90s where the court, Supreme Court, denied qualified immunity based upon the clarity of the language. The language in this administrative search statute is absolutely clear. It says you're limited to inspection. So we can walk, you know, there are a couple facets to this argument. I think the easiest is they exceeded the scope of the administrative search statute. Let me ask you one more just kind of a hypothetical question to see if I can figure out what you mean by inspection. So let's say the police officers show up. They find evidence of stolen property. And they're doing like what you said. They're standing there. They're, you know, they're going to go try to find some judge to get a warrant. And then the owner says, I'm going to drive this car away that you think is stolen. I'm going to what are the police officers supposed to do? I think they can, they can guard, they can stand down. They could stop the owner from taking the car away. And they can stand guard. They can wait, they can preserve the status quo while they're going to get a warrant. Yeah. See what's odd about that is that that is a seizure. You know that, right? I mean, if you can't move your property or take your property or whatever, like that is a seizure. So it seems like you're sort of conceding that they can seize the property. It just, it just seems hard to draw the line that you're drawing between an inspection on the one hand and a seizure on the other. That's, they clearly, in all searches, officers are allowed to preserve, preserve the, the, the scene of the crime in many cases, and up to a certain point, but seven hours to go get and get a, a, a search warrant that would allow them to seize the HHR or the, or the papers we contend is unreasonable. All right. Preserve some time for rebuttal. Thank you. Mr. Green. We'll hear from Mr. Bogan. Morning. Man Police Court. I'm Bruce Bogan. I represent Defendant Snowden. The District Court correctly granted qualified immunity to Defendant Snowden and Bisland based on a the, the charges that were ultimately determined to be with actually the approval of a, of a prosecutor or consulting with the prosecutor on the case with the state attorney's office. The warrant charging affidavit was factually correct. It contained no false statements by Snowden or Biden or Bisland, excuse me. And, you know, counsel referenced earlier the issues related to the veracity of Mr. Champion's testimony. But keep in mind the issue that we're dealing with here in this case is whether there was probable cause at the time that that warrant was issued. There was nothing at that point in the stage to suggest that the officers could not have relied upon Champion's statement or that his statements could not have been How can this not be a pretextual search to conduct a criminal investigation to gather evidence if there was an explicit seven-month-long investigation preceding this administrative search? There's plenty of time to get a warrant. So with respect to the administrative inspection on the 12th, obviously they went there with a warrant to arrest Mr. Landau. It was not pretextual from the standpoint that they had actual knowledge that there was other stolen vehicles such as the HHR. What they obviously went there to do was look for and search the administrative inspection for a tow yard like this. They were able to, as it relates to a towing and storage facility, look for stolen vehicles, vessels, outboard motors, investigating the titling and registration of the vehicle or vessels, inspecting vessels, vehicles. And so exactly that's what they went there to do. Here's my concern, and it doesn't go to ultimate qualified immunity issue about clearly established law, but on the question of whether or not that search was pretextual, how can there not be issues of fact? If you're at summary judgment, so you're looking at the facts in the light most favorable to the plaintiff, and you're drawing inferences in his favor, and given the length of the investigation, the timing of the search, the delay in getting the warrant, you put all that together, you're telling me that no reasonable fact finder could have said on the constitutional side, not the qualified immunity side, that the search was not pretextual. No rational jury could have come to that conclusion. It doesn't make it pretextual because they had a suspicion that there might be a stolen vehicle on the property. And that's what the Bruce case says. Agreed. But this case has more than that. If you have, you know, these administrative inspections, at least as I've learned through a number of years on the bench, are normally done at preset sequential times. Like, you know, every two months we're going to go do a sweep of these lots. Or every week we're going to go inspect nightclubs. And we can't do them all at once. So, you know, this week we'll do the ones in this quadrant, this week we'll do the ones in that quadrant, and whatever. But they're not usually done in the way that this one was done. Right? The timing is odd. Well, let me put it this way. When can one of these administrative inspections be pretextual? If you don't have the proverbial smoking gun, where someone is deposed and says, yeah, that was pretextual. I was trying to rely on the administrative exception as a cover, but it was pretextual. When can an administrative inspection ever be pretextual or allow a jury to find pretext? I suppose that the fact and circumstances were that the reason why you went there was not for the purpose of what you actually discovered. And so, for example, you thought it was a drug operation and you decided to go there and look for vehicles, but in the process you're looking for drugs. That, to me, would be pretextual. That you're using this administrative statute for purposes other than what it was designed. That, I believe, would be pretextual. So if you're doing it for criminal purposes, it's not pretextual? Even if it's for the same ill that the statute is designed to prevent? Well, the statute is... Okay, let me give you this example, which is, I think, a tough example for a police officer. It's not this case and it's not your client. It's just a hypothetical. A police officer goes, a case involving the Toline statute, provides a warrant to a neutral judicial officer and says, we think that they've got a stolen car in there. And here's the reasons why. And the judge says, you haven't given me probable cause. Denied. They come back again with more facts. Judge says, sorry, you still haven't shown probable cause to get in there. I'm not giving you a warrant for the lot, the tow operator's lot. Then they're like, okay, administrative inspection tomorrow. Can a jury find pretext? Well, obviously, if he's been to the judge twice presenting the same facts, then I guess I would need to know if he's going there the next day and looking for the same thing. My hypothetical, he is. He's looking for the same thing that you asked the judge for already. Of course he is, yes. That's my hypothetical. Then possibly that could be pretextual. Yes. What if they storm in with 13 officers and a tow truck? Thirteen officers and a tow truck, I don't think is unreasonable for the circumstances under which you consider how big the facility was and what they intended to accomplish in terms of conducting an inspection. Just like in the Bruce case, obviously, the court there determined the breadth and the nature of which they did, showing up with a SWAT team. There's no SWAT team here. There's no evidence that employees were lined up and searched. None of the things that happened in Bruce happened in this case. They didn't seize 100 vehicles like they did in the Bruce case. They were looking, obviously, for the HHR vehicle once they determined that there was, based on their earlier inspection, that there was a vehicle that they found when they came back. Obviously, with a warrant, then they got more information. If you're in the middle of an inspection and you uncover a stolen vehicle, what are the officers supposed to do? Ignore it. I think this statute does exactly what the officers are allowed to do. They followed the statute. It was not unreasonable or outside the scope of an administrative inspection. Thank you, Mr. Bogan. We'll hear from Ms. O'Leary. May it please the court. Erin O'Leary on behalf of Appley-Bisland. As the court recognizes, Appley-Bisland's interests are very similar to Appley-Snowden's. I'm not going to repeat the arguments that were just made, but would certainly welcome any questions if the court has any on those particular issues. Otherwise, I would just focus on the fact that the officers had arguable probable cause in this case. They did conduct a lengthy investigation, which you recognized. They interviewed several witnesses. One of those witnesses indicated that Mr. Landau had contacted him. This was the witness from the TAG agency and stated that it was his right to get the title to the vehicle and questioned why that hadn't been done automatically. That really provided a lot of proof to justify the arguable probable cause. What do you do about, and it may not be relevant or certainly not conclusive, but what do you do about the argument that Mr. Green makes that based on the Florida cases that the intent has to be earlier in time and that you can't infer the felonious intent from an act which takes place later? If you learn what's really going on later, it can't go back and give you the necessary mens rea at the earlier point in time. How does that factor into all of this? Well, the vehicle was picked up at the request of the Holly Hill Police Department because they located it, determined it was flagged as a stolen vehicle. Mr. English goes and picks it up. For whatever reason, Holly Hill Police Department was then not contacted to find out any more information about the owner of the vehicle. The tow sheet, it's undisputed that they apparently didn't have a copy of it, but the question is why. Apparently, it wasn't sent to them, but they didn't ask for it either. Mr. Landau testified that he was involved with the creation of the statute. He was very well-versed on the statute. He knew the requirements of the statute. He knew the steps that needed to be taken to identify owners of stolen vehicles, and despite all of that knowledge, didn't do very basic things such as contact the local Ford dealership to say, hey, we have this brand new convertible Mustang that we recovered as stolen or that we towed at the request of Holly Hill Police Department. Does it happen to belong to you? None of that was done. At some point in time, I think he could say that there was a knowing change in whatever their motivation was, and they argue, of course, that they weren't required to do that because reasonableness doesn't include those specific steps, but those seem to be some of the most basic obvious steps, and so you have to wonder, when one doesn't do that, does that provide the mens rea that would then support the felony charge? So I would argue that it does because it's, I mean, they know exactly what they're supposed to do. They know the steps that could be taken. They could have contacted Holly Hill again and say, hey, did you get any more information on this vehicle, but didn't. Yes, they did do the advertising, and they did the sale, and it wasn't sold, but very quickly raced off to go try to get title to it without taking very simple, easy steps to identify the facts that would provide the mens rea to support it, and I know we're running a bit behind, so if you don't have any other questions, I will just request that you affirm. Thank you. Ms. Flood? Good morning. I may have pleased the court. As counsel for both sides have elicited the facts relevant as to Officer Champion, his involvement in this investigation was minute. He was called In response, Doug English, who the city contracts with through Friars, showed up to tow the vehicle. Officer Champion, along with his supervisor on scene, began filling out a tow sheet. Mr. English signed that tow sheet. Mr. English also confirmed, and the record confirms this, that he was aware that the vehicle was stolen, and Officer Champion told him the vehicle was stolen. Mr. English loaded up the vehicle and took it back to Friars. Officer Champion, the next day, with the consent of Friars, did an inventory search and noted that on his report. The record is replete with testimony from appellant, from two of the appellant's longtime employees, Darcy Podgorski and Doug English, that Friars doesn't use a tow sheet. In fact, they rarely even receive a tow sheet when they do a tow for a law enforcement agency. Instead, they use a vehicle's identification number, their own documents, the tow truck driver's documentation, and their own systems to confirm who owns the vehicle. Ms. Podgorski testified at length that when she does a VIN search and it comes back with no owner, she knows that that means it has a manufacturer's certified ownership, i.e. it's owned by a dealership. So she knew that's the origin of the vehicle. Aside from that, Officer Champion gave a single informal statement to investigators. He then provided a sworn statement at the request of investigators with the state attorney's office and an entirely different agency. He then provided trial testimony pursuant to a subpoena. This inference that there was some lie or recanted testimony is simply unsupported by record evidence. I think, Judge Brasher, you hit the nail on the head when you said that the statement that's recanted or that is a lie was that Champion physically put pen to paper to fill out a tow sheet. And Champion, in the course of getting ready for testimony, said, oh, I think maybe my supervisor helped me fill that out. And that is some lie that appellants now say is the linchpin of probable cause for this affidavit. However, there's no single linchpin in this affidavit. Rather, there's layer upon layer upon layer of probable cause. If there were to be... And Champion, I mean, Champion's just a witness, right? I mean, he's not the investigating officer. He's not, he didn't seek a warrant, right? Correct. He had no involvement in seeking a warrant, pushing forward the investigation. There's no testimony that he even checked in with the investigators to say, hey, are we going to get Landau? I know he's out here committing these felonies. There was no contact. In fact, he didn't even know that an investigation was going on. And he didn't certainly know that an information was then filed by the state attorney. Again, he appeared for testimony as he's required to do. He was not granted immunity. He did testify. He was never charged with perjury. There's no record evidence to support that he lied. However, even if this court were to determine that the statement, I hand wrote this tow sheet, is a lie, that's certainly no linchpin for probable cause in this manner. Again, if there were to be one single linchpin, it would be the testimony of the tag and title agent who testified that he had a phone call with Mr. Landau well prior to this. And Landau said, why, you know, why are they getting this car from me? And he said, well, you know, it belongs to Gary Yeomans. And Mr. Landau said, I know it belongs to Gary Yeomans. And I know because it's a police tow. He knew that it was a stolen vehicle. Champion's testimony does not change the outcome of the arrest warrant one bit. You can take that statement out and probable cause remains. There's no question about that. And again, and I think it's important to state that the actual affidavit for arrest warrant contains Mr. Landau's assertion that he never received a tow sheet. It says Officer Champion towed the car, wrote the tow sheet, and gave it to Mr. Landau. However, Mr. Landau contested that statement. So clearly the trial court judge was aware that that statement was contested. And so he essentially does the step two analysis that's set forth in Aguirre and all of the cases regarding malicious prosecution. And he's done that analysis for us. He said, well, that's existing and Landau's contesting that. However, even with Landau contesting the fact that he never received a tow sheet, there is layer upon layer of probable cause for this arrest warrant. And for all those reasons, the district court's granting of summary judgment as to Champion should stand. As an aside, I don't believe that any of the other claims against Officer Champion were clearly raised in the appellate brief. And as such, they're waived regarding his, I guess, the claim for his involvement in the search and false arrest. And those are clearly unfounded and not clear in the appellate brief. And so we would defer once again to the district court judge's ruling. Thank you, counsel. Thank you. Mr. Glassman for Daytona Beach. May it please the court, Gary Glassman, Assistant City Attorney for the City of Daytona Beach. Now, I know that this court understands fully the requirements that the plaintiff must prove and show for there to be municipal liability. So I'm not going to waste time with that. But on this record, I don't think that there is any proof of any municipal liability in this particular case. They say that we don't train. Well, I think that we do. We prove that we train. We put into the record the number of hours and the amount of time that officers are trained for the City of Daytona Beach. They did not show multiple violations by the city regarding training. There is nothing in this record that shows that it was so obvious that additional training was needed to be shown or to be used for police officers of the City of Daytona Beach. They rely primarily on one case, Bakari, which did involve a ruse in the use of an administrative warrant as the district court held, Judge Antone. However, there was no ruse in this particular case. And more importantly, in that case, Judge Antone did not find any liability on the part of the city. So on this record, I just do not see anything there that can support a claim against the city under Section 1983. And with that, I will retire. Thank you, Counsel. Mr. Green, you reserve some time. Is this your last day at work? Is that what you're suggesting? I now no longer employee of the City of Daytona Beach. Congratulations. What if we remand this case? I'd just like to address a few points. First of all, we have two bases for liability. The city was put on notice in the Bakari case, the Judge Antone decision several few years before this, that the way the city conducted administrative searches was in violation of the Fourth Amendment. Second, however, just some training is not the kind of training that is or should be required regarding how to conduct administrative searches. This is not brain surgery. In terms of going through the Bruce case, the Bruce case talks extensively about exceeding the scope of the administrative search. You're saying there was no training at all, or that the training that was provided was substandard and deficient? It was not specific. My understanding of the record is there was no specific training. You took depositions and asked for documents. That's why I'm asking you. At least I haven't done a deep dive into the record. So it's just a question of what the record contains or doesn't contain. Was there any training or no training or substandard training? I'm not saying substandard. To my knowledge, there's nothing that specifically mentioned tolling statute or administrative searches. And if I'm wrong, I'm sure opposing counsel will correct me, but I don't recall that. And keep in mind, we have 20 volumes of appendices in this case. But my recollection is I don't recall seeing anything. Let's see. Second, I think counsel for the search warrant or the arrest warrant. The fact of the matter is there is a lot of cases that we cite in our briefs that talks about witnesses who make false statements to police can be liable. We rely on those cases. But one of the arguments that she made on behalf of Champion is that in the affidavit, your client's denial of getting the toast sheet is noted. How does that impact your claim of a false statement? Well, we have a number of false statements that we argue, especially in our reply brief. And of course, Mr. Landa was never provided the toast sheet. The argument before that was that Champion had provided English the toast sheet. And we know that that was false. And we also know what we do know is false is that Wisland and Snowden claimed that my client, in fact, or Friars, in fact, received a copy of the toast sheet based upon the testimony of Mr. How does the toast sheet matter so much when the towing company had its own protocols for figuring out how to determine the origin of a vehicle or the owner of a vehicle, et cetera, et cetera? Well, when in terms of the search warrant, when they make specific statements that turn out to be either false, partly false, or omit other statements, we think that calls into credibility everything. What we do know is that That's not, unfortunately for you, I don't think that's the law. The law is you excise the false, the supposedly false statements, and you look to see whether or not the remainder of the affidavit contains enough information to provide probable cause. And you add in omissions as well and to determine whether there's What do you mean you add in omissions? If the argument, if the claim is that there were misstatements or omissions of material fact, you take out the misstatements, you add in the omissions of material facts and determine whether that changes the calculus for probable cause. Okay. And then getting back to Judge Wilson's initial question, or one of his initial questions about Bruce versus Barry, you know, the court talks at length about how administrative searches must be cabined to the specific limitations therein. And while the court did say we do not hold that under no circumstances would an administrative search, similar to this, be reasonable, we only hold that under the facts of this case, the administrative search of Bruce's premises exceeded its limited scope. And that's where I don't think if you add in these other facts that makes an otherwise unreasonable administrative search reasonable. And based on this, we'd ask that the court reverse and remand for trial. Thank you. All right. Thank you, Mr. Green. Thank you, counsel. And we're going to take another recess, ten-minute recess. Court is in recess for ten minutes.